```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
                                   :    **FOR ELECTRONIC PUBLICATION**
ROBERT MARTINEZ,                   :
                                   :
                 Plaintiff,        :
                                   :
    - against -                    :    MEMORANDUM AND ORDER
                                   :
                                   :    Civil Action No.
AMALGAMATED TRANSIT UNION,         :    03-CV-6291
LOCAL 1056 AND NEW YORK CITY       :
TRANSIT AUTHORITY,                 :
                                   :
                 Defendants.       :
                                   :
----------------------------------X
```

TRAGER, District Judge:

Plaintiff Robert Martinez ("Martinez" or "plaintiff"), acting pro se, brings this employment discrimination action against his former employer, the New York City Transit Authority ("Transit Authority") and his former union, Amalgamated Transit Union, Local 1056 (the "Union") (collectively, "defendants"), alleging that he suffered unlawful discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). Defendants move for summary judgment to dismiss the action pursuant to Rule 56 of the Federal Rules of Civil Procedure.

**Background**

**(1)**

Martinez began working for the Transit Authority as a Bus Operator in 1985 and became a member of the Union around that

time.[1]  See Defendant Transit Authority's Statement of Material Facts Pursuant to Rule 56.1 ("T.A. 56.1 Statement") ¶ 2; id. at Ex. 13 at 49 (deposition of Robert Martinez).[2]  His nearly eighteen-year tenure was marred by an extensive disciplinary record that included several run-ins with supervisors.  See T.A. 56.1 Statement ¶ 2.  A transcript of his work history shows numerous warnings and reprimands, including at least nineteen separate suspensions.  See T.A. 56.1 Statement ¶ 2; id. at Ex. 2.  He was eventually dismissed in 2003.

The incident that led to plaintiff's dismissal took place on February 20, 2003, while he was working the overnight shift.  At approximately 12 a.m., plaintiff's supervisor, General Superintendent Joseph King ("King"), who was conducting an inspection of the depot, noticed that plaintiff was not wearing a mandatory safety vest and called out to him from a distance of about 30 feet, telling him to put it on.  See T.A. 56.1 Statement ¶ 11; id. at Ex. 12 at 3 (arbitration decision and award, dated

---

[1] Many of the facts of this case do not appear to be in dispute, and, where appropriate, uncontroverted facts will be taken from the Local Civil Rule 56.1 Statements provided by the Transit Authority and the Union.  Although Martinez has not filed a 56.1 Statement in opposition, and has neither admitted nor denied any of the assertions of fact set forth in the defendants' statements, all efforts will be taken to construe in his favor any factual disputes raised by the papers that Martinez has submitted.

[2] The Transit Authority has attached numerous exhibits to its 56.1 Statement.

2

March 7, 2003).

According to King, Martinez was holding a newspaper and responded that he was "too busy" to change into the appropriate gear. See Affidavit of Joseph King in Support of the Transit Authority's Motion for Summary Judgment ("King Aff.") ¶ 3. King issued a second request, but Martinez refused. After a third request, when Martinez continued to indicate that he was not going to comply, King took Martinez out of service and told him to leave the property. See King Aff. ¶ 3.

Martinez presents a different account of this encounter. He contends that he was carrying the newspaper to the nearest dumpster when the first request was made. When the request was issued a second time, at closer range, Martinez claims he began walking toward the locker room to comply. See Plaintiff's Amended Complaint ("Am. Cplt.") at 9.

After Martinez was told to leave the property, he went to the locker room to put on his safety vest. King, in the presence of several co-workers, told Martinez again to leave the premises and report to King's office the next morning. See T.A. 56.1 Statement ¶ 12; Am. Cplt. at 5. Martinez followed King to the office of the Line Supervisor, asking why he was being sent home. He also requested a "to/from" form in order to report his version of the incident. See Am. Cplt. at 5; T.A. 56.1 Statement Ex. 12 at 5-6. The Line Supervisor refused to give Martinez a "to/from"

3

form, and King told Martinez that the police would be contacted if he refused to leave the premises. See T.A. 56.1 Statement ¶ 12. Martinez again refused, and King called the police. After the police arrived and threatened to arrest Martinez, he agreed to leave the Transit Authority property. See T.A. 56.1 Statement ¶ 12.

After this incident, the Transit Authority issued a disciplinary action notice ("DAN") seeking Martinez's dismissal. T.A. 56.1 Statement Ex. 11. Later, the Transit Authority issued a second DAN, which charged plaintiff with a "failure to obey a direct order and surrender [his] transit pass on 2/21 and on 2/25/03." T.A. 56.1 Statement Ex. 12 at 2.

**(2)**

On March 7, 2003, pursuant to the collective bargaining agreement between the Union and the Transit Authority, the parties appeared before an arbitrator to determine whether there was just cause for Martinez's suspension and discharge. T.A. 56.1 Statement ¶ 10. The arbitrator found just cause for the dismissal and denied the Union's grievance in its entirety. See T.A. 56.1 Statement Ex. 12 at 10. The arbitrator concluded that on February 20, 2003, Martinez refused his supervisor's repeated direct orders to put on a safety vest and refused subsequent, repeated orders to leave Transit Authority property. See T.A. 56.1 Statement Ex. 12 at 7-8. The arbitrator also concluded that

on February 21, 2003, Martinez refused an order to turn in his Transit Authority pass. See T.A. 56.1 Statement Ex. 12 at 7-8. According to the arbitrator, the facts of the case showed a "clear and flagrant case of insubordination." T.A. 56.1 Statement Ex. 12 at 7. The arbitrator concluded that Martinez had "proven himself to be incorrigible, and the Authority need not keep such person in its employ." T.A. 56.1 Statement Ex. 12 at 10.

(3)

Martinez claims that racial and religious animus, in addition to retaliation for his past complaints against supervisors,[3] motivated the Transit Authority to terminate his employment. Martinez further claims that the Union breached its duty of fair representation at the subsequent arbitration hearing because of a similar racial and religious animus. With respect to this latter claim, Martinez claims that he was prejudiced because only his prior reprimands and infractions,[4] and not his

---

[3] These included two separate complaints against supervisors in 2000 or 2001 that led to his transfer from the Jamaica depot to the Queens Village depot, see Am. Cplt. at 7, and a December 6, 2001, written complaint against Supervisor Joseph Compitello ("Compitello") alleging harassment about the quality of his work. See Am. Cplt. at 7; T.A. 56.1 Statement Ex. 7. The exchange with Compitello led to disciplinary action against Martinez.

[4] On March 17, 1999, Martinez was demoted from the position of Bus Operator to Cleaner after being accused of attempting to run over a dispatcher with a city bus. See T.A. 56.1 Statement ¶ 3; id. at Ex. 3. The Transit Authority originally sought his dismissal but later agreed to the demotion after the Union filed

5

commendations, were brought up at the hearing.  Affidavit of Robert Martinez in Opposition to Defendants' Motion for Summary Judgment ("Martinez Aff.") at 6 (Dkt. No. 26).  He further complains that none of the witnesses to the exchange in the locker room were called to testify on his behalf, see Martinez Aff. at 6, and that the arbitrator never considered complaints by other employees against King.  Finally, Martinez claims that Antoine Breaux ("Breaux"), the Union representative who attended the hearing as Martinez's representative,[5] gave him poor advice during the arbitration because he does not like him personally.  See T.A. 56.1 Statement Ex. 13 at 62.

(4)

On June 10, 2003, Martinez filed complaints against both the

---

a grievance on his behalf.  On December 12, 2001, he received a DAN and ten-day suspension for insubordination.  Am. Cplt. at 7; TA. 56.1 Statement ¶ 5; id. at Ex. 5.  The penalty was initially modified but ultimately sustained in arbitration.  See T.A. 56.1 Statement ¶ 6; Ex. 7.  On August 30, 2002, Martinez was charged with insubordination for allegedly failing to follow orders from King, see T.A. 56.1 Statement ¶ 7; id. at Ex. 8, and on September 4, 2002, Martinez was brought up on dismissal charges after being accused of threatening a supervisor.  See T.A. 56.1 Statement Ex. 9.  The Transit Authority sought Martinez's dismissal for these incidents but agreed to a 30-day suspension after the Union filed a grievance on Martinez's behalf.  See T.A. 56.1 Statement Ex. 10.

[5] Antoine Breaux, who was the Recording Secretary of the Union at the time of the hearing, did not actively participate in the hearing.  Breaux's role was to accompany Martinez to the hearing and to give him non-legal advice off the record.  See Declaration of Antoine Breaux in Support of Local 1056's Motion for Summary Judgment ¶ 12.

6

Transit Authority and the Union with the New York State Division of Human Rights ("SDHR"). See T.A. 56.1 Statement Ex. 14; Union 56.1 Statement Ex. G. Martinez also authorized the SDHR to accept his charge on behalf of the U.S. Equal Employment Opportunity Commission ("EEOC"). See Memorandum in Support of Defendant Amalgamated Transit Union, Local 1056's Motion for Summary Judgement ("Union Mem.") at 4. The SDHR dismissed the complaints after it found "no probable cause" in support of Martinez's claims. See Union 56.1 Statement Ex. 15. The EEOC adopted the findings of the SDHR and also dismissed the charges but issued a "right to sue" letter to Martinez on February 19, 2004 allowing Martinez to file a federal claim under Title VII. See T.A. 56.1 Statement Ex. 16.[6]

Defendants have moved for summary judgment to dismiss Martinez's complaint. The Transit Authority contends that Martinez was terminated because of repeated incidents of insubordination, not racial animus. See TA. 56.1 Statement ¶ 9. Similarly, the Union contends that it did not discriminate against Martinez, but represented him diligently and in good faith.

---

[6] As the Supreme Court held in McDonnell Douglas Corp v. Green, 411 U.S. 792, 798 (1973), "the absence of a Commission finding of reasonable cause cannot bar suit under an appropriate section of Title VII."

## Discussion

Summary judgment is appropriate when there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is inappropriate where (1) the evidence presents a factual dispute that a reasonable jury could decide in favor of the nonmoving party, and (2) the fact in dispute will have a material affect on the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All inferences must be drawn from the underlying facts in a "light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Nevertheless, the party opposing summary judgment must put forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In cases such as the one at bar, bare allegations of discrimination "devoid of specifics, but replete with conclusions" are not enough. Bickerstaff v. Vassar Coll., 196 F.3d 435, 451 (2d Cir. 1999). See also Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

### (1)

### Claims against the Transit Authority

Martinez claims that his termination was the result of unlawful racial and religious discrimination. He further contends he was subjected to unlawful retaliation for past

complaints against supervisors.

**a.   Race/Religion Discrimination**

Martinez's employment discrimination claims are governed by the burden shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and its progeny.  In order to successfully bring a claim under Title VII, a plaintiff must first establish a <u>prima facie</u> case of discrimination.  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993).  If the plaintiff can meet this initial burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision in question.  <u>Id.</u> at 506-07.  If the defendant is able to do so, the presumption of discrimination "completely drops out."  <u>James v. New York Racing Ass'n</u>, 233 F.3d 149, 154 (2d Cir. 2000).  The court must then examine the complete record to determine if the plaintiff can satisfy his ultimate burden of proving that the adverse employment action was discriminatory and that the reason proffered by the defendant is pretextual.  See <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

In order to carry the initial burden of establishing a <u>prima facie</u> case of discrimination, Martinez must show that (1) he belongs to a protected class, (2) he performed his job satisfactorily, (3) he suffered an adverse employment action, and (4) the action occurred under circumstances giving rise to an

inference of discrimination.  See McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).  There is no question that Martinez suffered an adverse employment action and that he is a member of a protected class; however, as explained infra, there is serious doubt as to his employer's knowledge of his professed race and religion.

With respect to the second prong, Martinez is unable to establish that he performed his job satisfactorily.  Although he asserts satisfactory job performance, he provides no evidence to support that claim by way of a statement by a co-worker or supervisor.  See id. at 135 (affirming dismissal of Title VII complaint of plaintiff who could not demonstrate triable issue of fact of satisfactory performance).  Nor does Martinez detail in his statements any positive reviews by superiors; in fact, there appears to be no extended period of time in which Martinez was not disciplined.  Finally, there is extensive documentation detailing Martinez's unsatisfactory work history.  See T.A 56.1 Statement Ex. 2.  Therefore, Martinez cannot satisfy the second prong.

With respect to the fourth prong, Martinez must offer evidence to suggest that the circumstances surrounding his termination give rise to an inference of discrimination.  As an initial matter, he provides no direct evidence of this, and although he can attempt to raise an inference of discrimination

10

through circumstantial evidence, he must do so by showing that his employer "treated him less favorably than a similarly situated employee outside his protected group."  See Graham v. Long Island Rail Road, 230 F.3d 34, 39 (2d Cir. 2000).

Potentially relevant to this inquiry, Martinez claims that the day he was removed from duty for failing to wear proper gear, William Coffey ("Coffey"), a Cleaner who was wearing inappropriate work shoes, was not removed from duty.  Apparently, Coffey was asked to change his shoes after Assistant General Manager John Casey ("Casey") asked him to change.  Coffey complied with the order immediately, and was, therefore, not taken out of service like Martinez.  See Affidavit of John Casey in Support of the Transit Authority's Motion for Summary Judgment("Casey Aff.") ¶ 5.  However, Martinez alleges that the real difference comes down to race.  See Am. Cplt. at 10.  As evidence of this, Martinez claims that King himself did not instruct Coffey to change his shoes even though King would have likely passed through Coffey's work area before reaching Martinez's.  See Martinez Aff. at 4.  However, this theory, in addition to being highly speculative, does not ultimately change the fact that Coffey, and not Martinez, changed into proper attire when asked.  This fact, far from supporting Martinez's allegation of discrimination, actually suggests otherwise.  Consequently, Martinez fails the fourth prong as well.

Indeed, there is additional doubt whether Martinez's employer was even <u>aware</u> of Martinez's professed racial identity. Martinez considers himself Native American, and it is on this basis that he brings his race discrimination claim. <u>See</u> T.A. 56.1 Statement Ex. 13 at 28.[7] However, King and Casey both profess ignorance of, not to mention lack of animus toward, Martinez's Native American and Christian Apostolic (the basis of his religion discrimination claim) identities. <u>See</u> King Aff. ¶ 7; Casey Aff. ¶ 6. Martinez, for his part, admits that he has no direct knowledge that any of his supervisors at the Transit Authority or representatives at the Union knew that he was Native American or a Christian Apostolic. Instead, he surmises they knew of his race and his religion through word of mouth by co-workers at the depot. <u>See</u> T.A. 56.1 Statement Ex. 13 at 60. However, without a showing that an employer had knowledge that an employee is a member of a particular group, there can be no showing of discrimination. <u>See</u> <u>Robinson v. Adams</u>, 847 F.2d 1315, 1316 (9th Cir. 1987) ("An employer cannot intentionally discriminate against a job applicant based upon race unless the employer knows the applicant's race."); <u>see</u> <u>also</u> <u>Woodman v. WWOR-TV, Inc.</u>, _ F.3d _, 2005 WL 1384334, (2d Cir. 2005) (rejecting

---

[7] Martinez's parents were born in Puerto Rico, and he contends that the original inhabitants of Puerto Rico were Taino Indians and therefore all people who have descended from those inhabitants are "first and foremost" Native Americans. <u>See</u> T.A. 56.1 Statement Ex. 13 at 26-27.

12

plaintiff's prima facie case of unlawful age discrimination when employee could not demonstrate employer's awareness of employee's age relative to her replacement). This is yet an additional reason to reject Martinez's prima facie case.

Under the circumstances, there is no need to consider the Transit Authority's motivation for its action. Nevertheless, it should be mentioned that the employer appears to have had legitimate reasons for its actions, not least Martinez's acts of insubordination, coupled with his long history of disrespectful behavior toward supervisors.

The arbitrator's ruling against Martinez on the same issue is noteworthy as well and "provides significant support for the conclusion that there has been no discrimination." Vanhorne v. New York City Trans. Auth., 273 F.Supp.2d 209, 214 (E.D.N.Y. 2003). See also Collins v. City of New York Trans. Auth., 305 F.3d 113, 115 (2d Cir. 2002) ("Where an employee's ultimate termination depends upon, and is allowed by, a decision of an independent and unbiased arbitrator based on substantial evidence after a fair hearing, the arbitration decision has probative weight . . ."). The arbitrator appears to have made an unbiased decision after being presented with all of the material evidence, and, that decision, accordingly, is "entitled to great weight." Vanhorne, 273 F.Supp.2d at 215.

**b. Retaliation**

In order to make out a prima facie case of retaliation, a plaintiff must show (1) he was engaged in a protected activity, (2) he suffered an adverse employment action, and (3) an inference of a causal connection between the protected activity and the adverse action. Van Zant v. KLM Royal Dutch, 80 F.3d 708, 713 (2d Cir. 1996).

As an initial matter, the Transit Authority argues that the retaliation claim cannot be considered because, having never been part of plaintiff's complaint to the EEOC, the claim is unexhausted. "To hear a Title VII claim, that claim must have been included in the EEOC charge or be reasonabl[y] related to the allegations in that charge." Bryant v. Begin Manage Program, 281 F.Supp.2d 561, 573-74 (E.D.N.Y. 2003) (Trager, J.). But even assuming, arguendo, that the "retaliation claim is closely related to [the] discrimination claim," id. at 574, the retaliation claim still fails to satisfy the three prongs of the prima facie case.

Martinez cannot meet the first prong because he does not show that his complaints against supervisors were protected activities. Two activities are protected from retaliation under Title VII: (1) opposing an act of discrimination made unlawful by Title VII and (2) participating in an investigation under Title VII. See Sumner v. U.S. Postal Service, 899 F.2d 203, 208 (2d

14

Cir. 1990). Plaintiff's complaints against supervisors, by contrast, were for harassment regarding the quality of his work. Martinez makes no claim that this harassment was based on a reason made unlawful by Title VII. Therefore, his complaints were not protected activities. See Santucci v. Veneman, 2002 WL 31255115 (S.D.N.Y. Oct. 8, 2002) (complaints regarding work-scheduling system were not protected activities).

Martinez also fails to satisfy the third prong requiring a causal connection between the activity and the adverse employment action. It does not appear that Martinez alleges any connection other than the fact that his termination followed his filing of a grievance. But even the "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001) (citation omitted). The two-year time lapse between Martinez's latest complaint and his termination certainly exceeds that requirement. See Hughes v. Derwinski, 967 F.2d 1168 (7th Cir. 1992) (four-month gap between filing of grievance and issuance of disciplinary letter could not, standing alone, raise inference of retaliation). Under the circumstances, Martinez does not raise a genuine issue of fact that retaliation played any role in his dismissal.

**(2)**

**Claims against the Union**

It is well established that a union may be subject to Title VII liability for breaching its duty of fair representation. Carrion v. Enterprise Assoc., Metal Trades Branch Local Union 638, 227 F.3d 29, 33 (2d Cir. 2000). To successfully bring such a claim, a plaintiff must prove, by a preponderance of the evidence, that the union breached its duty, and that the breach was caused by a discriminatory intent made unlawful by Title VII. See Greenslade v. Chicago Sun-Times, Inc., 112 F.3d 866-67 (7th Cir. 1997); Kozera v. International Broth. of Elec. Workers, AFL-CIO, 230 F.Supp.2d 413, 421 (S.D.N.Y. 2002).

In order to establish that a union has breached its duty, the plaintiff must show that the union's conduct: (1) was "'arbitrary, discriminatory, or in bad faith,'" Barr v. United Parcel Service, Inc., 868 F.2d 36, 43 (2d Cir. 1989) (quoting Vaca v. Sipes, 385 U.S. 171, 190 (1967)), and (2) "'seriously undermine[d] the arbitral process.'" Id. (quoting Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 567 (1976)). Although each case is highly fact-dependent, courts give unions significant leeway in deciding how to best represent their members. To establish conduct made in bad faith, a plaintiff must show substantial evidence of the union's "fraud, deceitful action or dishonest conduct." Amalgamated Ass'n of St., Elec.

Ry. & Motor Coach Employees v. Lockridge, 403 U.S. 274 (1971). Conduct amounting to negligence does not necessarily constitute a breach. See United Steelworkers of America v. Rawson, 495 U.S. 362, 372-73 (1990). See also White v. White Rose Food, 62 F.Supp.2d 878, 884 (E.D.N.Y. 1999) ("Negligence or 'tactical errors' on the part of the union are insufficient to establish a breach of the duty of fair representation.").

As evidence of the Union's breach of duty, Martinez contends: (1) his prior disciplinary infractions, but not prior commendations, were considered, (2) no witnesses were called on his behalf and (3) King's past disciplinary record was not introduced, making it harder for Martinez to discredit King's testimony on the ultimate issue whether the order was disobeyed.

However, any prior commendations would unlikely insulate him from adverse findings based on his extensive history of infractions, and in any event, he offers no evidence of any formal letters or notices of commendation. Moreover, Martinez does not mention any possible witnesses who could have offered material testimony in support of his account of the exchange with King. With respect to the Union's decision not to attack King's prior record, plaintiff offers no concrete evidence that such a record exists. Such a decision to attack the credibility of an opposing witness would in any event fall within an attorney's discretion and would not run afoul of the duty of fair

17

representation.

Even if the these decisions constituted tactical errors – and it is unclear that they do – they still would not rise to the level of a violation of the duty of fair representation. See Commodari v. Long Island University, 89 F.Supp.2d. 353 (E.D.N.Y. 2000) (Trager, J.) (holding that it was within the union's discretion whether or not to pursue a particular grievance against a plaintiff's employer), aff'd, 62 Fed. Appx. 28, 2003 WL 1785893 (2nd Cir. Apr 02, 2003). Without deciding if these decisions were tactical errors, they obviously do not approach arbitrary or discriminatory conduct.

As it happens, the Union's representation of Martinez during the arbitration, as noted by the arbitrator, appears to have been quite good indeed. In his written report, the arbitrator specifically commended the Union for its rigorous advocacy on Martinez's behalf, commenting on the Union's efforts at "muster[ing] all of the possible defenses that an advocate might make in such a situation. Indeed, the Union, in an attempt fully and competently to represent Grievant, has attempted to expand the matters to be considered." See T.A. 56.1 Statement Ex. 12 at 8. As far as Breaux, the union representative, is concerned, the advice he offered Martinez at the arbitration seems to be completely adequate. See Breaux Decl. ¶ 6 (advising Martinez "to keep his hands in front of him," "look at the arbitrator while

speaking" and answer "only the question asked" both "succinctly and concisely").  Although a plaintiff in Martinez's situation is not entitled to error-free representation, see Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 567 (1976), the advocacy he received by all Union representatives appears to have been excellent, and certainly commensurate with the standards of fair representation required under Title VII.

## Conclusion

For the foregoing reasons, the defendants' motions for summary judgment are granted, and plaintiff's claims are dismissed with prejudice.  The Clerk of the Court is directed to close the case.

Dated:  Brooklyn, New York
        June 23, 2005

                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge

SENT TO:

Robert Martinez
218-38 140th Avenue
Springfield Gardens, NY 11413

Margaret Ann Malloy
Gladstein, Reif & Mcginniss, LLP
817 Broadway, 6th Floor
New York, NY 10003

Daniel Lawrence Topper
NYC Transit Authority
130 Livingston Street
Brooklyn, NY 11201